**AT & T COMMUNICATIONS OF THE SOUTHWEST, INC., Plaintiff,**

v.

**SOUTHWESTERN BELL TELE-PHONE COMPANY, et al., Defendants.**

Nos. 97–1573–CV–W–5, 97–4337–CV–W–5, 98–0540–CV–W–5, 98–0501–CV–W–5.

United States District Court, W.D. Missouri. Western Division.

Aug. 31, 1999.

938

Paul S. DeFord, Alok Ahuja, William C. Odle, Lathrop & Gage L.C., Kansas City, MO, Michael D. Warden, David L. Lawson, Sidley & Austin, Washington, DC, Mark Witcher, Michelle Bourianoff, Austin, TX, for AT & T Communications of the Southwest, Inc., plaintiffs.

Kirk J. Goza, Michael D. Moeller, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, Michael K. Kellogg, Sean A. Lev, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, Paul G. Lane, Diana J. Harter, Southwestern Bell Telephone Co., St. Louis, MO, for Southwestern Bell Telephone Co.

Penny G. Baker, Missouri Public Service Commission, Dana K. Joyce, Missouri Public Service Commission, Jefferson City, MO, Marc D. Poston, Columbia, MO, for Missouri Public Service Commission, Sheila A Lumpe, M Dianne Drainer, Harold Crumpton, Connie Murray, defendants.

Theodore Hirt, U.S. Dept. of Justice, Washington, DC, for Federal Communications Com'n

**ORDER AFFIRMING IN PART AND REMANDING IN PART THE ORDERS OF THE MISSOURI PUBLIC SERVICE COMMISSION**

LAUGHREY, District Judge.

These consolidated cases come to this Court for judicial review of an administrative order entered by the Missouri Public Service Commission ("PSC") pursuant to the Telecommunications Act of 1996 ("the Act," "the Telecommunications Act"), Pub.L. 104–104, 110 Stat. 56 (codified at various sections of 47 U.S.C.).[1] The Telecommunications Act ended the era of monopoly-based local telephone service by eliminating legal barriers to competition and by requiring local telephone companies to lease elements of their existing networks to new competitors. In the absence of an agreement between the local company and its competitors, the Act authorizes state utility commissions to determine the terms of these interconnection contracts and the price which the local company can charge its competitors for interconnection services. These consolidated cases involve interconnection agreements between Southwestern Bell Telephone Company ("SWBT") and AT & T Communications of the Southwest ("AT & T"), which have been ordered by the PSC.

## I. The Telecommunications Act of 1996

"It would be gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity. It is in many respects a model of ambiguity or even self-contradiction." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 738, 142 L.Ed.2d 835 (1999) (Justice Scalia, delivering the opinion of the Court). Even for the United States Supreme Court, interpreting the Telecommunications Act is no simple task. An understanding of the Act's overall structure and purpose therefore provides an essential background for addressing the many issues raised by the parties in these consolidated cases.

Until the 1990s, local telephone service was regarded as a natural monopoly. *Id.* at 726. States, therefore, granted exclusive franchises to one local exchange carri-

---

1. AT & T and SWBT also characterize their briefs as suggestions in support of motions for summary judgment. The Court, however, will treat this case as an appeal from an administrative order. *See* 47 U.S.C. § 252(e)(6) (providing for review of state commission decisions in federal district courts).

er ("LEC") in each area. In exchange, the LECs were required to provide universal service and were subjected to pervasive regulation by state commissions. This legal arrangement encouraged LECs to develop extensive networks that branched out to reach every customer in a particular area. The networks were expensive to build and maintain, and duplication of a network was thought to be economically infeasible.

In the 1990s, however, technological advances convinced Congress that competition in local telephone markets was not only possible but also desirable. Congress believed that consumers would reap the benefits of competition in the form of lower prices and better quality services. First Report & Order at ¶ 3, *In re Implementation of Local Competition Provisions*, 11 FCC Rcd. 15499 (1996) (*"Local Competition Order"*) (listing the principal goals of the Act). Congress, therefore, designed the Act "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act, *quoted in Iowa Utils. Bd. v. F.C.C.*, 120 F.3d 753 (8th Cir.1997), *rev'd in part on other grounds*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

To achieve its goal of ending monopoly based local telecommunication services, Congress preempted state laws that granted exclusive franchises to incumbent local exchange providers ("ILECs"). Realizing that potential competitors would be deterred from entering local telecommunications markets if they had to build entire networks from the ground up before they could begin providing services, Congress also required ILECs to share their networks with new competitors referred to as competitor local exchange providers ("CLECs"). S. Conf. Rep. 104–230, at 148 ("it is unlikely that competitors will have a fully redundant network in place when they initially offer local service.").

The Telecommunications Act imposes the following requirements on ILECs. First, an ILEC must allow its competitors to "interconnect" their equipment to the ILEC's network at "any technically feasible point," thus enabling competitors to process telephone calls through the network. 47 U.S.C. § 251(c)(2)(B) (Supp. 1998). This interconnection must be "at least equal in quality" to that which the incumbent provides to itself. § 251(c)(2)(C).

Second, an ILEC must provide access to "network elements," on "an unbundled basis." § 251(c)(3). A network element is defined broadly as "a facility or equipment used in the provision of a telecommunications service." § 153(29). Competitors have a right to purchase network elements separately, "in a manner that allows requesting carriers to combine such elements in order to provide telecommunications service." § 251(c)(3). In determining which network elements must be provided, the FCC was directed to consider whether access was "necessary" and whether the failure to provide such access would impair a CLEC's ability "to provide the services that it seeks to offer." § 251(d)(2). The rates ILECs may charge both for interconnection and unbundled network elements ("UNEs") must be "based on the cost . . . of providing the interconnection or network element." § 252(d)(1). Also, both interconnection and UNEs must be provided "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." § 251(c)(2)(D) and (c)(3).

Finally, an ILEC must sell its complete retail services at wholesale prices so that competitors can resell those services to their customers. § 251(c)(4). Wholesale rates are retail rates minus the "costs that will be avoided" by selling to a competitor rather than a customer, such as marketing, billing, and collection. § 252(d)(3). ILECs are forbidden from imposing "unreasonable or discriminatory conditions or limitations" on the resale of these services. § 251(c)(4)(B).

The Act's requirements raise a host of questions when applied to a particular local telephone network. What is a network element? What kind of interconnection or level of unbundling is technically feasible? What are an ILEC's costs of providing services? All such issues must be resolved for incumbents and new competitors to enter interconnection agreements allowing competitors to use incumbents' networks. Parties, state commissions, and courts are to be guided in their efforts to answer such questions by regulations passed by the Federal Communications Commission ("FCC"). § 251(d)(1). Congress also designed an elaborate dispute resolution system. First, when an incumbent receives a request for interconnection, it may try to reach an agreement with its potential competitor through negotiations. § 252(a). In the event that these negotiations leave some issues unresolved, state utility commissions may arbitrate these disputes, § 252(b)(1), unless the state declines to act, in which case the disputes are arbitrated by the FCC. Congress required that all issues presented for arbitration should be resolved within nine months after the ILEC received the initial request for interconnection. § 252(b)(4)(C). Finally, federal courts hear appeals from the decisions of these state agencies or the FCC. § 252(e)(6) (providing for review in federal district courts).

## II. *The PSC's Proceedings*

### A. The First Arbitration

After the Telecommunications Act was passed in 1996, AT & T and SWBT began negotiating about an interconnection agreement, but these negotiations failed to resolve all of the issues between them. On July 29, 1996, AT & T filed a Petition for Arbitration with the PSC. On August 16, 1996, MCI filed a similar petition. The PSC consolidated the two cases.

The PSC allowed the parties to file written testimony and held formal hearings including cross-examination between October 8 and October 17, 1996. One key issue in this arbitration was the amount AT & T would be required to pay to use SWBT's network. The parties presented evidence of the Total Element Long Run Incremental Cost ("TELRIC") of providing this access, because FCC regulations then in effect mandated that this methodology be used to determine rates under the Telecommunications Act. *See* 47 C.F.R. §§ 51.503, 51.505 (1999). On October 15, 1996, however, the Eighth Circuit stayed these regulations in part because it found that the FCC lacked jurisdiction to issue them. *Iowa Utils. Bd.*, 120 F.3d at 799.

On December 11, 1996, the PSC entered an order setting interim rates using the TELRIC methodology. This order also required SWBT to allow AT & T to use its dark fiber and purchase its subloops separately, i.e., unbundled. On December 20, 1996, SWBT moved for rehearing on the grounds that the interim rates should not have been calculated under the stayed FCC regulations that mandated the TELRIC methodology. On January 22, 1997, the PSC denied the motion in a show order.

The PSC next confronted the task of setting permanent rates. It ordered its staff to meet with SWBT personnel for two to three days each week in SWBT's offices, "where software, data, and subject matter experts responsible for critical input values will be readily available." [Order Granting Clarification and Denying Rehearing at 9, Record on Appeal ("ROA") 1117]. AT & T would be excluded from these meetings because "SWBT will perhaps be required to disclose extraordinarily confidential information, including trade secret and other proprietary matter." [*Id.*]. Similarly, staff would meet at AT & T's offices to gather information, and SWBT was excluded from these meetings. Despite AT & T and SWBT's objections, the PSC followed this investigative procedure.

In its Order, the PSC had also announced that it would issue proposed rates and allow the parties to comment before setting permanent rates. [Id. at 9–10].

On June 9, 1997, the PSC issued a notice stating that the parties would have 30 days to comment on proposed rates before they were adopted.[2] On July 31, 1997, the PSC issued a Final Arbitration Order adopting permanent rates without previously allowing the parties to comment on any proposed rates. The order stated that "in the interests of due process, the Commission will allow the parties twenty days to move for reconsideration or clarification." [Final Arb. Order at 2, ROA 1368]. During this twenty-day period, the order did not go into effect.

The Final Arbitration Order referenced a lengthy Costing and Pricing Report issued by the PSC staff, and explained that it based its decision only on information included in the Report: "The [Report] contains several hundred pages and constitutes a thorough and exhaustive review of each and every cost factor which the Commission finds relevant to this arbitration." [*Id.* at 1371]. The staff considered only competing TELRIC models, even though SWBT had argued that historical costs should be used to set rates. In the Final Arbitration Order, the PSC adopted its staff's recommendations. On August 20, 1997, SWBT moved for rehearing arguing in part that the procedure used to set permanent rates violated numerous statutes and the federal constitution. The PSC denied the motion, arguing that its procedures were proper because it was conducting an arbitration rather than a civil trial.

On October 10, 1997, the parties filed an interconnection agreement ("the Agreement")[3] consistent with the PSC's prior orders. The Agreement included terms stating that SWBT would provide combinations of network elements even if these elements were separate in its own network. On October 30, 1997, SWBT filed a Notice of Clarification advising the PSC that the regulations requiring incumbents to provide combinations of network elements had been vacated by the Eighth Circuit and attempting to preserve its objection to providing combinations of network elements. [ROA 1551]. The Agreement was approved by the PSC on November 5, 1997. In a subsequent Order, the PSC rejected SWBT's argument in the Notice of Clarification, noting that "the Eighth Circuit's recent ruling in *Iowa Utilities Board* has not made SWBT's and AT & T's contract provisions illegal." [ROA 1984].

## B. The Second Arbitration

On September 10, 1997, AT & T filed a second petition for compulsory arbitration, alleging that there were still unresolved issues about pricing additional unbundled network elements. On October 24, 1997, AT & T and SWBT filed a joint list of 160 remaining unresolved issues. On October 30, 1997, the PSC announced a different procedure to resolve these issues—a mediation followed by an arbitration. The PSC appointed its general counsel to be a Special Master for the proceeding. Under the announced procedures, the parties were first to file written testimony relevant to each disputed issue. The Special Master and staff were then to conduct a lengthy mediation. After the mediation, AT & T and SWBT were to file a Settlement Document identifying the issues that had been resolved in the mediation. They were also to file a Statement of Remaining Issues in "the form of a single pleading filed jointly by AT & T, SWBT and the Special Master." [Order Adopting Procedural Schedule at 5, ROA 1748]. The Statement was to include AT & T and SWBT's proposed language and the Special Master's recom-

---

**2.** On July 18, 1997, the Eighth Circuit invalidated the FCC's pricing regulations and held that local incumbent providers need not provide combinations of network elements that exist separately in their own networks. *Iowa Utils. Bd.*, 120 F.3d at 799, 813.

**3.** The term "Agreement" is something of a misnomer because it refers both to terms ordered by the PSC and terms voluntarily agreed to by the parties. When appropriate for clarification, the Court will distinguish between various arbitral decisions and agreements by using dates or other indicators.

mendation about which proposal should be adopted. AT & T and SWBT could subsequently file responses to the Special Master's recommendations. The PSC would then issue an arbitration order based on the documents filed and any technical expertise provided by its staff. This procedure was followed.[4]

On December 23, 1997, the PSC issued a Report and Order largely accepting the Special Master's recommendations. It also rejected AT & T's proposal that SWBT be required to purchase all necessary licenses and "right to use agreements" necessary to allow AT & T to use SWBT's network without incurring liability. However, it ordered SWBT to provide a list of all known licences applicable to the relevant network elements, to use its best efforts to facilitate AT & T's attempts to obtain the necessary licences and agreements, and to negotiate for the provision of alternate elements if a necessary license could not be obtained. On March 4, 1998, the parties filed their agreement. The Agreement was approved on March 19, 1998.

### C. The Supreme Court's Decision in *Iowa Utilities Board*

On January 25, 1999, the Supreme Court overturned parts of the Eighth Circuit's decision in *Iowa Utilities Board*. Specifically, the Supreme Court held that the FCC had jurisdiction to promulgate regulations under the Telecommunications Act, including the regulations mandating the use of TELRIC methodology to measure costs. *AT & T,* 119 S.Ct. at 732-33. The Court expressly declined to rule on the issue of whether the TELRIC regulations are a valid interpretation of the Telecommunications Act. *Id.* at 728, n. 3. It is expected that the Eighth Circuit will address this issue when the case is remanded. *Id.* at 738. The Supreme Court also vacated an FCC regulation listing network elements that incumbent providers of local

telephone service would be required to make available to requesting carriers, on the grounds that these elements were chosen under a faulty interpretation of the Act's necessity and impairment standards. *Id.* at 735 (interpreting 47 U.S.C. § 251(d)(2)). Finally, the high court upheld an FCC regulation requiring ILECs to provide network elements in combination that were already combined in the ILEC's own networks. *Id.* at 738.

Because the Supreme Court's opinion was promulgated after this case had been briefed, the parties were allowed to submit supplemental briefing about the impact of the High Court's decision. The parties were encouraged to discuss what issues in this case had been rendered moot by the decision, and what issues had been affected in some other way.

### III. *Standard and Scope of Review*

In this appeal, the scope of review will be limited to the administrative record compiled by the PSC. The statutory language relevant to judicial review reads as follows:

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

47 U.S.C. § 252(e)(6). Because the statute simply provides for district court review, without setting forth a specific standard applicable of review, the appeal is confined to the record and no de novo proceeding may be held. *Guaranty Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.,* 794 F.2d 1339, 1342 (8th Cir.1986) (*quoting United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)); *accord GTE South, Inc. v. Morrison,* 6 F.Supp.2d 517, 523 (E.D.Va.

---

4. According to SWBT, the testimony "filed" before the mediation was not placed in the administrative record.

1998) (reaching same conclusion in Telecommunications Act case).

■ In evaluating the record, the Court reviews the PSC's findings of fact under the arbitrary and capricious standard. *See Guaranty Savings & Loan Ass'n,* 794 F.2d at 1343 (courts review factual determinations by agencies under arbitrary and capricious standard); *GTE South,* 6 F.Supp.2d at 523 (arbitrary and capricious standard should be used to review state commission decisions under Telecommunications Act); *US West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997) (same). When applying the arbitrary and capricious standard, courts

> consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. [We are] not empowered to substitute our judgment for that of the agency.

*Guaranty Savings & Loan Ass'n,* 794 F.2d at 1343 (8th Cir.1986) (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). This highly deferential standard of review is especially appropriate when reviewing findings of fact made by agencies enforcing the Telecommunications Act, because the findings may be highly technical and specific to any idiosyncrasies in the incumbent carrier's network.

The parties disagree about the standard of review to be applied to the PSC's resolution of questions of law. AT & T and SWBT contend that the PSC's legal conclusions are to be reviewed de novo, while the PSC contends that its interpretations of the Telecommunications Act are entitled to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* deference. The *Chevron* court explained that federal courts should defer to the legal conclusions of administrative agencies that are based on permissible constructions of ambiguous statutes:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The *Chevron* court based this conclusion on at least two facts—Congress's power to delegate policy decisions to administrative agencies, and the expertise of federal executive agencies. First, the Court explained

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. . . . If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Id.* at 843–44, 104 S.Ct. 2778 (*citing United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)). Second, the Court noted that it should defer to agency conclusions "whenever . . . a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Id.* at 844, 104 S.Ct. 2778.

Consistently, however, courts have held that interpretations of federal law by state agencies are not entitled to *Chevron* deference. *See Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491, 1495 (9th Cir.1997), *cert. denied,* 522 U.S. 1044, 118 S.Ct. 684, 139 L.Ed.2d 632 (1998) (state agency interpretation of Medicaid Act reviewed de novo); *Turner v. Perales,* 869 F.2d 140, 141 (2d Cir.1989) (state agency interpretations of housing statute reviewed de novo); *Amisub (PSL), Inc. v. State of Colo. Dep't of Soc. Servs.,* 879 F.2d 789, 795–96 (10th Cir.), *cert. denied,* 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990) ("The state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency."). These courts have emphasized that "*Chevron's* policy underpinnings emphasize the expertise and familiarity of the federal agency with the subject matter of its mandate and the need for coherent and uniform construction of a federal law nationwide. Those considerations are not apt [to a state agency]." *Belshe,* 103 F.3d at 1495–96 (*quoting Turner,* 869 F.2d at 141).

Similarly, the district courts that have considered this issue in the context of the Telecommunications Act have concluded that state agencies interpreting this Act are not entitled to *Chevron* deference. *See GTE South,* 6 F.Supp.2d at 524 (legal conclusions by state commissions reviewed) (de novo); *Hix,* 986 F.Supp. at 19 (same). The *Hix* court reasoned that *Chevron* deference would be inappropriate because state commissions, unlike federal agencies, are not subject to congressional oversight, and because state commissions lack the expertise and nationwide perspective of federal agencies in implementing federal law. *Hix,* 986 F.Supp. at 17.

 Finally, a de novo standard of review for legal issues raised by the Telecommunications Act is consistent with the text of the Act. Congress provided that federal courts reviewing state commission decisions shall "determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). This language does not suggest a deferential standard of review. The Court, therefore, will review *de novo* whether the PSC's interpretation of the Act was correct.

## IV. *Jurisdiction*

 On January 23, 1998, the PSC and its officers "the State Defendants" filed a motion to dismiss based in part on Eleventh Amendment immunity. On April 30, 1998, the Court denied the motion. At that time, many federal courts had held that the Eleventh Amendment did not bar suits against state commissions and their officials. *See, e.g., U.S. West Communications, Inc. v. MFS Intelenet, Inc.,* 35 F.Supp.2d 1221, 1229–30 (D.Or.1998); *US West Communications, Inc. v. Public Serv. Comm'n of Utah,* 991 F.Supp. 1299, 1301 (D.Utah 1998). These courts reasoned that states consented to suit by agreeing to arbitrate disputes arising under the Telecommunications Act. *See, e.g., MFS Intelenet,* 35 F. Supp.2d at 1229–30. Such participation was considered a voluntary waiver of Eleventh Amendment immunity. *See, e.g., Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (noting that states may voluntarily waive their Eleventh Amendment immunity by participating in a federal program).

After this Court denied the motion to dismiss, the Supreme Court rendered its decision in *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). In *College Savings Bank,* the Supreme Court overruled those cases which had held that states "constructively" waived their sovereign immunity by voluntarily participating in activities regulated by federal statutes. *Id.* at 2228 (overruling *Parden v. Terminal Ry. of Ala. State Docks Dep't,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)). In *Parden,* the Supreme Court had allowed

employees of a railroad owned and operated by the State of Alabama to bring an action against the State under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51. The *Parden* court reasoned as follows:

> By enacting the [FELA] ... Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit.

377 U.S. at 192, 84 S.Ct. 1207 (*quoted in College Sav. Bank*, 119 S.Ct. at 2226). The *College Savings Bank* Court reversed *Parden*, holding that state sovereign immunity was not subject to "Parden-style waivers." *Id.* at 2229.

However, the Supreme Court noted that Congress may still encourage states to voluntarily waive their immunity by promising a gratuity or gift to states that do so. *Id.* at 1231. The Court therefore distinguished two cases: *Petty v. Tennessee–Missouri Bridge Comm'n*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); and *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). *Petty* held that states consented to suit when they entered an interstate compact approved by Congress that included a provision subjecting them to suit. 359 U.S. at 280–81, 79 S.Ct. 785. *South Dakota* held that Congress may condition a grant of funds to states upon their taking certain actions that Congress could not constitutionally require them to take. 483 U.S. at 211–12, 107 S.Ct. 2793. The *College Savings Bank* Court concluded that *Petty* and *South Dakota* remained good law for the following reason:

> Under the Compact Clause ... States cannot form an interstate compact without first obtaining the express consent of Congress; the granting of such consent is a gratuity. So also, Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts. In the

present case, however, what Congers threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity.

119 S.Ct. at 2219. Thus, the question for this Court is whether the Telecommunications Act uses a gift or gratuity to entice states to waive their immunity, or whether it compels states to do so by excluding them from otherwise permissible activity.

One district court has held that the rule of *College Savings Bank* barred federal court review of decisions by state commissions under the Telecommunications Act. *Wisconsin Bell, Inc. v. Public Serv. Comm'n of Wis.*, 57 F.Supp.2d 710, 714–15 (W.D.Wis.1999). The court found that the Telecommunications Act imposed a sanction on states that refused to waive their immunity, by restricting their right to regulate telecommunications:

> [A] state's continuing to regulate local telephone carriers is hardly the acceptance of a "gift" in the same way that accepting highway funding is characterized in *College Savings Bank*. A state's continued regulation of local enterprise (local telephone carriers) is an "otherwise permissible activity" that can yield no inference as to a state's motivation for doing it.

*Id.* at 715–16.

The Court in this case, however, is not reviewing the state's general regulation of the local telecommunications industry. Rather, it is reviewing the PSC's interconnection order to determine if it complies with federal law. Absent Congressional authority, the PSC would have no right to participate in the unique dispute resolution process devised by Congress, in which the PSC is authorized to arbitrate disputes between private telecommunication companies. State commissions, however, may exercise this privilege only if they consent to federal court review of their actions. § 252(e)(6) (expressly providing for district court review of state commission actions).

If a state prefers to retain its sovereign immunity, the FCC "shall assume the responsibility of the State commission under this section." § 252(e)(5). "This statutory structure gives each state the option to involve itself in the regulatory scheme or to let the FCC act in its place." *MCI Telecommunications Corp. v. Illinois Commerce Comm'n*, 183 F.3d 558, 565–66 (7th Cir.1999). Hence, the Act preserves existing state authority to regulate local telecommunications, but the Act does impose obligations on the state if it voluntarily chooses to be the arbiter of disputes involving interconnection agreements.

For these reasons, the Telecommunications Act is analogous to the spending clause cases described in *College Savings Bank*. The Telecommunications Act granted states a right that they previously lacked—the right to participate in the resolution of disputes between ILEC and LEC. The states were free to decline this gratuity if they chose. Indeed, one other district court has already reached this conclusion. *US West Communications v. Mecham*, 2:98CV490K (D.Utah Aug. 16, 1999).

 If this Court were to reach the opposite conclusion, then states would be allowed to implement a federal dispute resolution scheme free from judicial review.[5] Although Congress cannot force states to administer federal programs, when states voluntarily participate in such enterprises "the power of federal courts to enforce federal law thus presupposes some authority to order state officials to comply." *New York v. United States*, 505 U.S. 144, 179, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Furthermore, the Supreme Court has emphasized, in *dicta*, that states participating in implementing the Act will be subject to federal oversight: "[T]here is no doubt ... that if the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel." *Iowa Utils. Bd.*, 119

S.Ct. at 730, n. 6. For all of these reasons, the Court concludes that the state defendants voluntarily waived their immunity from suit by conducting the arbitrations at issue in these cases.

 Furthermore, *College Savings Bank* in no way restricted the applicability of the *Ex parte Young* doctrine to suits against state officials in their official capacities. Under the *Young* doctrine, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). For this reason, the Eleventh Amendment presents no barrier to federal court cases against state officials seeking prospective compliance with federal law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Supreme Court has recently affirmed the vitality of the *Young* doctrine. *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 2263, 144 L.Ed.2d 636 (1999). The Sixth Circuit and several district courts have already ruled that state commissioners could be sued under *Young* for violating the Act. *Michigan Bell Tel. Co. v. Climax Tel.*, 186 F.3d 726, 730–33 (6th Cir.1999) (suit presented "straightforward *Ex parte Young* case."); *Public Serv. Comm'n of Utah*, 991 F.Supp. at 1300; *MFS Intelenet*, 35 F.Supp.2d at 1229.

Nor is *Young*'s applicability limited by the Supreme Court's decision in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252, *cert. denied*, 517 U.S. 1133, 116 S.Ct. 1416, 134 L.Ed.2d 541 (1996). The Telecommunication Act's provision for federal judicial review is far simpler than the "detailed remedial scheme" described in the Indian Gaming Regulatory Act challenged in *Seminole Tribe*. *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 1998 WL 156678 at *11 (N.D.Ill. March 31, 1998) (reaching

---

5. State courts lack jurisdiction to review the actions of state commissions. § 252(e)(6). Thus, if federal court review is precluded by

the Eleventh Amendment, no court would have jurisdiction over state commission decisions.

this conclusion), *but see Wisconsin Bell*, 57 F.Supp.2d at 713–14 (reaching the opposite conclusion). Therefore, even if the Court lacked jurisdiction over the PSC, these cases could proceed against the commissioners in their official capacities.

■ Finally, to the extent the parties have raised issues related to the validity of regulations adopted by the FCC, this Court lacks jurisdiction. FCC regulations adopted pursuant to the Telecommunications Act may only be challenged in the United States Court of Appeals. 28 U.S.C. § 2342(1) ("The court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend ... or to determine the validity of all final orders of the FCC."); *accord United States v. Any and All Radio Station Transmission Equip.*, 169 F.3d 548, 551 (8th Cir.1999) ("the court of appeals has exclusive jurisdiction to determine the validity of all final orders of the FCC."). For the purposes of this proceeding, therefore, FCC regulations that have not been vacated are authoritative law. *Southwestern Bell Tel. Co. v. Arkansas Pub. Servs. Comm'n*, 738 F.2d 901, 906 (8th Cir.1984) (reversing district court for evaluating validity of FCC regulations because statute grants exclusive jurisdiction over this issue to appellate courts).

## V. *Discussion*

On the merits, both AT & T and SWBT appeal from the PSC's decision. SWBT raises the following challenges: (1) the pricing methodology used by the PSC violates the 1996 Act, undermines Congress's intent, and raises constitutional difficulties; (2) the arbitration violated its constitutional right to due process of law; (3) the PSC unlawfully required SWBT to offer network elements in combination; (4) the PSC unlawfully expanded SWBT's obligation to provide network elements; and (5) the PSC unlawfully failed to provide any means for SWBT to limit its liability

to AT & T customers and failed to consider this cost in setting rates. AT & T raises the following challenges to the PSC's decision: (1) the PSC violated the Act by erecting unnecessary and discriminatory restrictions on AT & T's ability to access SWBT's essential elements; and (2) the PSC unreasonably banned "end-user aggregation" and resale of promotional offerings of fewer than 90 days. The Court will address these issues in turn.

### A. Whether the PSC's Pricing Decisions were Arbitrary and Capricious

### 1. Whether the PSC Should Have Used TELRIC Methodology

■ SWBT originally asserted that the forward-looking TELRIC methodology applied by the PSC violated the Telecommunications Act or the United States Constitution. These claims have been rendered moot by the Supreme Court's decision in *Iowa Utilities Board*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835. When SWBT raised these issues, the regulations requiring state commissions to apply TELRIC methodology had been vacated by the Eighth Circuit on the grounds that the FCC lacked the jurisdiction to promulgate them. *Iowa Utils. Bd.*, 120 F.3d at 799. While this appeal was pending, the Supreme Court reversed the Eighth Circuit's decision and held that the FCC did have jurisdiction to issue the TELRIC regulations. *Iowa Utils. Bd.*, 119 S.Ct. at 733. It also remanded the case to the Eighth Circuit for further proceedings. *Id.* at 738. As noted earlier, validly promulgated FCC regulations are not subject to challenge in district courts. SWBT therefore asks this Court to defer ruling on its challenges to the PSC's application of TELRIC methodology until the Eighth Circuit rules on the validity of the forward-looking TELRIC regulations on remand.[6] The PSC agrees with SWBT's

---

6. SWBT also argues that the TELRIC regulations are not currently in effect. It reasons that the Eighth Circuit vacated the regulations, and that the Supreme Court did not order their reinstatement. The Court finds

this argument disingenuous. The Eighth Circuit vacated the regulations on jurisdictional grounds, 120 F.3d at 794, and the Supreme Court held that the FCC had jurisdiction to

position that review of the TELRIC issue is premature at this time. AT & T takes the opposite stance, and asks the Court to affirm the PSC's application of TELRIC to set rates.[7]

The Court will not defer ruling on SWBT's challenges to the validity of TELRIC methodology. Resolution of these issues should not be delayed because of the possibility that the Eighth Circuit may vacate the TELRIC regulations when reviewing them under the deferential *Chevron* standard. Because the TELRIC regulations are binding in this proceeding, the Court affirms the PSC's decision to apply the TELRIC methodology to set rates.

## 2. Whether the PSC Applied TELRIC Arbitrarily and Capriciously

Next, SWBT argues that even if the PSC were correct to apply TELRIC methodology, it "made numerous arbitrary adjustments" when computing forward-looking costs. First, SWBT asserts that the PSC arbitrarily reduced its estimate of nonrecurring costs by fifty percent. SWBT also argues that the PSC improperly excluded inflation from its pricing model when approving a three-year contract. Finally, SWBT asserts that the PSC removed many cost items from the rates of specific elements without then recategorizing these items as "common costs."

 The PSC failed to address these issues in its brief, but AT & T argued that the PSC's decisions were justified. SWBT argues that "AT & T cannot fill the void left by the State agency's failure to defend its decisions." It is true that courts generally limit their review of agency rulemakings to the grounds upon which the agency relied. *See Overton Park,* 401 U.S. at 419, 91 S.Ct. 814 ("post hoc rationalizations" insufficient to support agency decision); *Securities and Exch. Comm'n v. Chenery Corp.,* 318 U.S. 80, 88,

63 S.Ct. 454, 87 L.Ed. 626 (1943) (confining review of agency decision to "the grounds upon which the [agency] itself based its action."). However, SWBT does not allege that AT & T is advancing new arguments upon which the PSC did not rely when it made its decisions at the administrative level. Rather, SWBT asserts that any arguments not made by the PSC in this proceeding should be deemed waived. AT & T has standing to defend the PSC's adjudication of its rights under the Telecommunications Act, and the Court will consider its arguments even if they were not advanced by the PSC in this litigation, as long as they are supported by the administrative record. *See Farmers Union Cent. Exch. v. Federal Energy Regulatory Comm'n,* 584 F.2d 408, 417 n. 22 (D.C.Cir.), *cert. denied,* 439 U.S. 995, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978) (winning party in administrative proceeding may defend agency decision in federal court despite agency's refusal to take a position in the litigation).

 Proceeding to the merits of SWBT's arguments, the Court rejects SWBT's contention that the PSC arbitrarily excluded 50% its nonrecurring costs ("NRCs") for unbundled network elements ("UNEs"). NRCs are one-time costs that SWBT will experience when it leases its network to AT & T. The PSC decided to reduce SWBT's estimate of NRC's by 50% in its Arbitration Order of July 31, 1997. Attached to this order was a lengthy Costing and Pricing Report ("Report") issued by the PSC Staff. In this Report, the PSC Staff noted that high NRCs created barriers to market entry: "Staff is not suggesting the cost of NRCs be set solely based upon the incentives they create. Staff does believe that is an important consideration when considering the validity of the information presented by each party

---

issue the regulations. 119 S.Ct. at 731. The Supreme Court thereby reinstated the regulations.

7. The FCC asks this Court to remand the pricing issues to the PSC with an order to

reconsider its pricing decisions in light of the TELRIC regulations. The PSC did apply TELRIC methodology when making its pricing decisions, so a remand on this ground would serve no purpose.

and the effect these charges will have on the development of competition." [Report at 129]. SWBT argues that the PSC's decision should be overturned because it impermissibly relied on this policy factor to reduce its estimate of NRCs.

Having reviewed the Report, the Court is convinced that the PSC relied on the effect of NRCs on competition primarily to analyze the credibility of the estimates provided by both parties. Because high NRCs discourage competition, SWBT would be expected to overestimate them, while AT & T would be expected to underestimate them. Furthermore, the PSC based its decision to reduce SWBT's NRCs on flaws in the data from which SWBT compiled its estimate of its NRCs. The PSC Staff expressed concern that SWBT's estimate of labor time was based upon evidence provided by subject matter experts, rather than time and motion studies: "As the labor estimate is the primary input into the NRCs, its accuracy is of utmost importance." [Report at 128]. The Staff also noted that SWBT's labor costs were double-counted. They were included in its estimate of NRCs and in the "labor factors" included in other costs. [*Id.*]. The Staff explicitly based its recommendation on these two problems with SWBT's estimate: "Given that SWBT's estimation of these NRCs is based solely on the opinions of [subject matter experts] and the fact that at least a portion of these NRCs are recovered through the cost factors applied to UNEs, Staff cannot recommend that the Commission accept the NRCs proposed by SWBT." [*Id.* at 131]. Thus, the PSC Staff's reference to a policy factor does not render their measurement of SWBT's NRC's arbitrary and capricious or violative of the Telecommunications Act.

 SWBT next argues that the PSC improperly excluded inflation from its pricing model when it approved a three-year contract. The PSC Staff noted that the cost of labor and capital increases over time, but reasoned that this inflation would be offset by increased efficiency. [*Id.* at 126]. SWBT argues that because the PSC's forward-looking methodology already assumed the use of the most efficient technology available, productivity gains that could occur during the duration of the contract had already been taken into account. For this reason, SWBT argues that inflation should have also been included in the pricing model. The PSC Staff specifically considered and rejected this argument in its Report. *Id.* The staff reasoned that the estimates of operating and maintenance expenses were "based upon historic data from the current network." *Id.* Thus, the estimates did "not reflect the productivity gains associated with the new forward-looking technology." *Id.* The PSC's finding that the effects of inflation would be offset by gains in productivity is neither arbitrary nor capricious. Therefore, its ruling will be upheld.

 Finally, SWBT argues that the PSC Staff failed to modify the "common cost allocator" to accord with other adjustments it made. Common costs are those that cannot be attributed to a specific network element. Overhead and administrative expenses are examples of common costs. These costs are incorporated into the pricing model by including a multiplier to the rate charged for each network element. This multiplier is the common cost allocator. The PSC adopted the common cost allocator proposed by SWBT. Nevertheless, SWBT argues that when the PSC Staff removed some of the cost items from the rates for network elements, it should have recategorized "at least some of" these rejected network element costs as common costs and adjusted the common cost allocator accordingly. [SWBT Sugg. at 36]. SWBT has not shown that the PSC's decision was arbitrary or capricious, because it has failed to note any specific costs that should have been recharacterized as common costs. SWBT has not demonstrated that any of the costs excluded by the PSC were even related to common costs such as overhead and administrative expenses. Thus, SWBT has fallen far short of demonstrating that the PSC acted arbitrarily or capriciously in failing to recharacterize the excluded costs as common costs.

## B. Whether the PSC's Procedures Were Adequate

### 1. Whether the PSC Violated SWBT's Right to Due Process

SWBT's due process argument originally focused on its complaint that the PSC refused to allow it to submit evidence relevant to the selection of a pricing methodology and to its historic costs. [SWBT Sugg. at 23]. SWBT asserted that the PSC should have used historic costs to set rates, and that its failure to consider these costs violated due process. Because the Supreme Court upheld the TELRIC regulations in *Iowa Utilities Board,* however, SWBT can no longer make this argument. As explained in the previous section, these regulations mandate that rates be set using forward-looking costs rather than historic costs. Thus, SWBT suffered no prejudice from the PSC's refusal to consider evidence of historic costs. Nevertheless, in its supplemental briefing SWBT continued to advance a due process challenge. SWBT's due process argument now focuses on additional procedures it claims were constitutionally required, without alleging how the PSC's decisions would have been different if these procedures had been used.

 To determine whether agency procedures accord with the constitutional guarantee of due process, courts examine the context of each case. Different amounts of process are due in different situations: "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *accord Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230, *cert. denied,* 368 U.S. 869, 82 S.Ct. 22, 7 L.Ed.2d 70 (1961); *Hannah v. Larche,* 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307, *reh'g denied,* 364 U.S. 855, 81 S.Ct. 33, 34, 5 L.Ed.2d 79 (1960). The burden of proving that constitutional guarantee of due process has been violated rests with the party claiming that the violation occurred. *See, e.g., Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, Inc.,* 762 F.2d 1137, 1140 (1st Cir.1985) *(citing Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)).

 The parties present the Court with three competing lines of cases that they claim define the requirements of due process in this case. The PSC cites cases upholding voluntary arbitration procedures against due process attacks. SWBT relies on cases interpreting the requirements of due process in the context of administrative hearings. Finally, AT & T cites cases describing the requirements of due process in agency rulemaking proceedings. However, the PSC's arbitrations were not rulemaking proceedings, true adjudications, or voluntary arbitrations. The PSC's arbitrations were obviously not voluntary, because SWBT was required to participate. More process is required when arbitration is mandatory than when it is voluntary:

> The simple and ineradicable fact is that voluntary arbitration and compulsory arbitration are fundamentally different if only because one may, under our system, consent to almost any restriction upon or deprivation of a right, but similar restrictions or deprivations if compelled by government must accord with procedural and substantive due process.

*United States v. American Soc'y of Composers, Authors, and Publishers,* 708 F.Supp. 95, 96–97 (S.D.N.Y.1989). Also, while the arbitrations included aspects of both rulemaking and adjudication, they do not fit neatly into either category. To determine whether an agency proceeding is a rulemaking or an adjudication, courts consider several factors. One factor is whether the agency action "single[s] out any particular [party] for special consideration based on its own peculiar circumstances." *United States v. Florida East Coast Ry.,* 410 U.S. 224, 246, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), *aff'd,* 417 U.S. 901, 94 S.Ct. 2595, 41 L.Ed.2d 207 (1974). An-

other factor is whether the agency's decision is prospective or retrospective. *Virgin Islands Hotel Ass'n, Inc. v. Virgin Islands Water and Power Auth.*, 476 F.2d 1263, 1268 (3d Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973). Retrospective decisions are more likely to be adjudications. Finally, courts consider whether historical or policy factors are more important to the decision. *Id.* Applying these factors to this case reveals that the arbitrations combined aspects of both adjudication and rulemaking. While the PSC's proceedings were quite fact-specific, the resulting decision was prospective and rested on both historical and policy factors. Thus, none of the lines of cases cited by the parties controls this case.

 Only a few cases have interpreted the Due Process Clause in the context of mandatory arbitrations like those conducted by the PSC. Essentially, these precedents have applied the balancing of public and private interests described in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See, e.g., Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Va. Pension Fund*, 718 F.2d 628, 640 (4th Cir.), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984) ("Congress may require arbitration so long as fair procedures are provided and ultimate judicial review is available"); *see also Lyeth v. Chrysler Corp.*, 929 F.2d 891, 896 (2d Cir.1991). *Mathews* balanced three factors to determine the requirements of due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* Under the *Mathews* balancing test, administrative agencies need not follow the same procedures as federal district courts:

> The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decision-making in all circumstances. The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and an opportunity to meet it." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–172, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurther, J, concurring). All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," *Goldberg v. Kelly*, 397 U.S. 254, 268–269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (footnote omitted) to insure that they are given a meaningful opportunity to present their case.

*Id.* at 348–49, 96 S.Ct. 893.

 The private interest at stake in these arbitrations was obviously quite large. SWBT had invested billions of dollars in its network, and the PSC proceedings determined the terms and conditions under which SWBT would be required to lease that network to its competitor. However, the governmental interest in the arbitrations was also significant. Congress passed the Telecommunications Act "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104–104 (1996), *quoted in Iowa Utils. Bd.*, 120 F.3d at 791–92. To secure these advantages for consumers as soon as possible, Congress required that interconnection agreements be arbitrated within nine months[8] of a potential competitor's request for interconnection. *Id.* at 791–92; 47 U.S.C. § 252(a);

---

8. Of course, Congress cannot override the requirements of due process by imposing arbitrary time limits for the resolution of disputes.

Rather, this time limit is a relevant indication of society's interest in rapidly introducing competition to the local telephone market.

47 U.S.C. § 252(b)(1). Despite these deadlines, the first arbitration took more than one year, and the second took more than six months.[9] After reviewing the record, the Court is convinced that the PSC and the parties worked diligently during this period to develop the interconnection agreement. In short, the private interest at stake in the arbitration weighs in favor of extensive procedures, while the public interest weighs in favor of a prompt resolution. The remaining question is whether the value of the additional safeguards proposed by SWBT outweighs their cost.

SWBT points to four procedural safeguards that it alleges that the PSC failed to provide at various times during the two arbitrations at issue. First, SWBT argues that the PSC should have avoided *ex parte* contacts during the permanent pricing phase of the first arbitration. Second, SWBT asserts that the PSC should have placed all information upon which it relied in the formal record. Third, SWBT asserts that the PSC should have allowed it to cross-examine AT & T's witnesses during both arbitrations. Finally, SWBT contends that it should have been allowed to present testimony directly to the PSC during the second arbitration.

 As SWBT's counsel admitted in oral argument, SWBT has made no specific allegation that it was prejudiced by the PSC's failure to follow its recommended procedures. Most claims of due process violations require a specific allegation of prejudice. *Estes v. State of Texas,* 381 U.S. 532, 542, 85 S.Ct. 1628, 14 L.Ed.2d 543, *reh'g denied,* 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965); *accord Griffin–Bey v. Bowersox,* 978 F.2d 455, 456 (8th Cir. 1992); *United States v. Hood,* 593 F.2d 293, 296 (8th Cir.1979). This rule is also applied in administrative cases. *See, e.g., United States v. Torres–Sanchez,* 68 F.3d 227, 230 (8th Cir.1995) (due process challenge to deportation hearing); *Citizens State Bank of Marshfield, Mo. v. Federal Deposit Ins. Corp.,* 751 F.2d 209, 213–14 (8th Cir.1984) (due process challenge to FDIC adjudication). In the absence of a specific allegation of prejudice, a litigant making a due process challenge must show that the "procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes,* 381 U.S. at 544, 85 S.Ct. 1628 (holding that the use of television cameras in the courtroom violated a criminal defendant's right to due process, even though it was difficult to discern exactly how the defendant had been prejudiced). Because SWBT has made no specific allegation of prejudice, it must show that the PSC's procedures were inherently lacking in due process such that prejudice should be presumed.

 Regarding *ex parte* contacts, the Court first notes that SWBT has not established that the PSC relied on any secret information. The PSC's order adopting permanent rates attached a lengthy report detailing all of the facts upon which it relied: "The Costing and Pricing Report contains several hundred pages and constitutes a thorough and exhaustive review of each and every cost factor which the Commission finds relevant to this arbitration." [ROA at 1371]. The Costing and Pricing Report was included in the record certified to this Court for review. "The designation of the administrative record, like any established administrative procedure, is entitled to a presumption of administrative regularity. The court assumes the agency properly designated the administrative record absent clear evidence to the contrary." *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 740 (10th Cir.1993) (citation omitted). Thus, the Court will presume that all of the information underlying the PSC's order was set forth in the Costing and Pricing Report.[10]

---

9. As described in the fact section of this opinion, for a few months both arbitrations proceeded simultaneously.

10. The cases cited by SWBT holding that *ex parte* contacts violated due process were all cases where the agency relied on information from outside the record. *See, e.g., Ohio Bell*

Nevertheless, SWBT makes a strong argument that the *ex parte* contacts rendered the arbitration at issue inherently lacking in due process. The PSC relied heavily on its staff's recommendations when setting rates, and these staff members had met extensively with AT & T before making their recommendations. Such contact between close aides to the decisionmaker and a party about the merits of a decision ordinarily should occur only in the presence of the other party. *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 57 (D.C.Cir.) *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977) (decisionmakers should refuse to engage in *ex parte* communication with interested parties). The prohibition of *ex parte* contacts ensures that parties may respond to the evidence against them and explain any errors in their opponent's analysis. Thus, the PSC's decision to meet separately with AT & T and SWBT was highly irregular,[11] and could violate due process if it had prejudiced SWBT.

After lengthy deliberation, however, the Court concludes that the PSC's investigation was not so irregular that prejudice should be presumed. The contacts between PSC staff and AT & T were not secret. Rather, the PSC explained to both parties the procedure it would follow to gather information. Having gathered the relevant information, the PSC then shared all relevant facts with SWBT, and allowed it to move for reconsideration. If SWBT found some flaw in the PSC's facts, it could have corrected it at that time. *See Home Box Office*, 567 F.2d at 57 (any *ex parte* contacts that occur should be summarized on the record so that opposing parties may respond); *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814 (in most cases, court should not require testimony regarding the evidence an agency considered to reach a decision). Thus, the Court concludes that SWBT's due process rights were not violated by the *ex parte* contacts between PSC staff and AT & T.

SWBT further asserts that the PSC failed to place the evidentiary basis of its decisions in the formal record for this Court to review. Due process ordinarily requires that agencies place the full evidentiary basis of their decisions in the record, so that courts can conduct meaningful appellate review. *United States Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 533 (D.C.Cir.1978). SWBT emphasizes that the PSC failed to conduct the second arbitration on the record. The procedure used in the second arbitration was a hybrid of mediation and arbitration. The mediation was an off the record proceeding designed to help the parties reach agreements about contested issues. At the time of the mediation, the parties were aware that any remaining disputes would be arbitrated by the PSC. Because none of the issues resolved in the mediation are contested in this case, the Court's review is not at all impeded by the lack of a formal record of the mediation. SWBT also notes that the testimony submitted before the mediation was not admitted into evidence. SWBT concedes, however, that "this testimony was of minimal use even to the Special Master." [SWBT Sugg. at 20]. Thus, SWBT has not shown that judicial review is in any way impeded by the omission of this testimony from the record presented to this Court. Indeed, the voluminous record submitted has proven more than adequate to allow this Court to review each challenge raised by the parties to the PSC's decisions.

SWBT also argues that all testimony should have been cross-examined. However, such a procedure would have greatly increased the cost of the arbitra-

*Tel. Co. v. Public Utils. Comm'n of Ohio*, 301 U.S. 292, 300, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). These cases are distinguishable because SWBT has not established that the PSC relied on information that was not placed in the record in the Costing and Pricing Report.

11. This case amply demonstrates that "alternative dispute resolution," far from being a panacea, has is own challenges and deficiencies.

tions without significantly improving the accuracy of the PSC's decisions. During the arbitrations, the PSC often relied on written testimony. Requiring these witnesses to testify only in person would have greatly lengthened the PSC's proceedings. Also, the probable value of cross-examination in a case involving technical issues is less than in a case in which a witness's credibility and veracity are at issue. "A number of courts have held in cases which ... involved complex and technical factual controversies, that written submissions, possibly supplemented by oral argument, suffice." *Virgin Islands Hotel Ass'n*, 476 F.2d at 1268; *accord Louisiana Ass'n of Independent Producers and Royalty Owners v. F.E.R.C.*, 958 F.2d 1101, 1113 (D.C.Cir.1992) (cross-examination not required on a "purely technical issue capable of being resolved not on the basis of a witness's motive or memory, but rather upon an analysis of the conflicting data and a reasoned judgment as to what the data shows."). Technical cases like this one typically turn on inferences to be made from fact, rather than upon the credibility of witnesses. Such inferences are best supported by argument, rather than live testimony. The record reveals that SWBT was provided with several opportunities to present such argument. For this reason, the Court is unconvinced that the PSC's refusal to allow cross-examination of some witnesses violated due process.

▮ Finally, the Court is unconvinced that the PSC's refusal to allow SWBT to submit additional evidence at some points in the arbitrations violated SWBT's constitutional rights. SWBT was not allowed to submit any testimony about the propriety of TELRIC methodology, but as noted in the previous section, the propriety of TELRIC methodology cannot be challenged in this Court. SWBT's only other claim is that it should have been allowed to present additional testimony during the second arbitration. SWBT admits that it was allowed to submit written testimony to the

Special Master who conducted the mediation segment of this arbitration and to participate in several days of oral presentations before the Special Master. Furthermore, after the Special Master issued his recommendations, SWBT was allowed to file a formal response with the PSC before the final Report and Order was issued. SWBT objects because it was not allowed to submit further testimony after the mediation but before the Special Master issued his recommendations. Given the many opportunities SWBT had to present information to the Special Master, it cannot seriously contend that it was denied the opportunity to be heard.

In sum, SWBT has not shown that it was prejudiced by any of the alleged procedural defects in the PSC's arbitrations. Given the likely cost and limited value of the additional safeguards SWBT proposes, along with the substantial government interest in introducing competition into the local telecommunications market, SWBT has failed to establish that the *Mathews* balance tips in its favor.[12]

### 2. Whether the PSC's Procedures were Arbitrary and Capricious

▮ Next, SWBT argues that the PSC's procedures were arbitrary and capricious. Much of SWBT's briefing on this point repeats its procedural due process arguments. The Court will not reiterate its analysis of these arguments. SWBT does make one new allegation in its claim that the PSC acted arbitrarily and capriciously, which is that the PSC did not follow its own announced procedures. Agencies generally have a duty to follow their own announced rules. *Gardner v. F.C.C.*, 530 F.2d 1086, 1090 (D.C.Cir.1976). The *Gardner* court reversed an agency decision after the agency promised to give the parties personal notice of its decision and then neglected to do so. The D.C. Circuit reasoned that "the Commission has

---

12. The Court's finding that the minimal requirements of due process were satisfied in this case, should not be interpreted as an

endorsement of the approach taken by the PSC.

created a reasonable expectation in the parties to the proceeding that such notice will be received.... Thus having created the expectation, the Commission ought not to be heard to say that its own rule does not create a legal burden of giving notice." *Id.*

In this case, SWBT alleges that the PSC issued a formal letter on June 17, 1996, stating that the arbitration would be conducted under procedures applicable to contested cases, and that *ex parte* contacts would be prohibited. SWBT argues that it was arbitrary and capricious for the PSC to ignore these announced procedures during the permanent pricing phase of the first arbitration and the entirety of the second arbitration. AT & T argues that the letter established procedures only for the first phase of the first arbitration. Even if the letter purported to set procedures for the entire arbitration, it was not arbitrary or capricious for the PSC to change those procedures for the permanent pricing phase of the first arbitration and the second arbitration. Unlike the agency in *Gardner*, the PSC notified the parties of the procedure it would follow at each phase of the arbitrations. Before the permanent pricing phase of the first arbitration, the PSC issued an order establishing the procedure for setting permanent rates. The Order of January 22, 1997, stated that the PSC Staff would conduct investigations at the offices of AT & T and SWBT. During these meetings, the staff would allow the parties to explain their costing models and inputs. The Staff was then to issue proposed rates. Similarly, on October 30, 1997, the PSC announced yet another procedure for the second arbitration. In this proceeding, the Special Master was to conduct a mediation which would be followed by an arbitration. The PSC also announced that it would base its decision in the arbitration on the pleadings filed and its own technical expertise. The Court does not find it arbitrary or capricious for the PSC to conduct the three phases of the arbitrations in this case under three different procedures. For each of the arbitrations, the PSC first announced the procedure that it would use and then proceeded to follow that procedure. The PSC was well within its discretion to use different procedures to suit the various stages of the arbitrations at issue in this case. *See Iowa Beef Processors, Inc. v. Illinois Central Gulf R.R. Co.,* 685 F.2d 255, 259 (8th Cir.1982) (noting that agency procedures are more flexible than court procedures).

SWBT also argues that the PSC violated its own procedures by failing to allow comments on proposed rates before they were adopted. The PSC announced on January 22, 1997, and June 9, 1997, that the parties would have an opportunity to respond to the staff's pricing recommendations before they were adopted. The PSC instead adopted permanent rates on July 31, 1997, and allowed the parties to move for reconsideration. The order had a delayed effective date of August 20, 1997. SWBT argues that the PSC's decision should be reversed under the rule of *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707, 721 (8th Cir.1979). In that case, the Eighth Circuit noted that "[p]ermitting the submission of views after an administrative decision has been made is no substitute for the right of interested persons to make their views known to the agency in time to influence the administrative process in a meaningful way." *Id.* at 720 (internal quotation omitted). Unlike the plaintiffs in *Oglala Sioux Tribe,* however, SWBT had several opportunities to make its views known to the PSC before permanent rates were set. The PSC decided to issue permanent rates without allowing the parties to comment on proposed rates to expedite an arbitration that had gone on for far longer than the nine months allowed by the Telecommunications Act:

> The Commission finds it appropriate to establish permanent rates at this time so that this matter may be resolved in such a way as to maximize the opportunities for these parties to move Missouri toward local competition. Rather than delay this matter by an additional 30 days for comment, the Commission will make

this its final order. However, in the interests of due process, the Commission will allow the parties twenty days to move for reconsideration or clarification. [Final Arbitration Order, ROA 1370]. Given the time constraints on the arbitration, the PSC was not arbitrary or capricious when it decided to issue permanent rates, but make them subject to a 20–day comment period.

### 3. Whether the PSC Violated State Statutes and Regulations

 SWBT finally argues that the PSC's procedures during the arbitrations violated several state statutes and regulations. Because the PSC's arbitration was a *sui generis* proceeding, no state procedural law was controlling. *See US West Communications, Inc. v. Minnesota Pub. Utils. Comm'n,* 55 F.Supp.2d 968, 986–88 (D.Minn.1999) (reaching this conclusion under Minnesota law). Congress required that disputes under the Telecommunications Act be resolved by arbitration. The plain meaning of this term would indicate that Congress did not intend for commissions to use traditional state law methods of rulemaking or adjudication to resolve disputes.

 Even if Congress intended to incorporate state procedural law in the Telecommunications Act, the PSC did not violate Missouri law in conducting the arbitrations. First, SWBT contends that the arbitration qualifies as a "contested case" under MAPA. MAPA imposes several procedural requirements in a contested case, which is defined as "a proceeding before an agency in which legal rights, duties, or privileges of specific parties are required by law to be determined after a hearing." Mo.Rev.Stat. § 536.010(2). "The 'law' referred to in the contested case definition encompasses any statute or ordinance, or any provision of the state or federal constitutions that mandates a hearing." *State ex rel. Yarber v. McHenry,* 915 S.W.2d 325, 328 (Mo. banc 1995). Thus, SWBT argues, MAPA applies to the arbitration at issue in this case, because the decision could not be made without a

hearing because of the due process clause. SWBT also alleges that the PSC violated a section of Missouri's Uniform Arbitration Act. This statute provides that parties to arbitrations "are entitled to be heard, to present evidence material to the controversy, and to cross-examine witnesses appearing at the hearing." Mo.Rev.Stat. § 435.370(2).

The PSC correctly points out that its proceedings are not governed by MAPA or Missouri's Uniform Arbitration Act. Rather, the PSC is allowed to design its own procedures. Mo.Rev.Stat. § 386.410(1) ("All hearings before the [Public Service] Commission or a Commissioner shall be governed by rules to be adopted and prescribed by the Commission."); *State ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n,* 592 S.W.2d 184, 187 (Mo.App. 1979) (holding that MAPA does not apply to the PSC because this agency already had its own procedures before MAPA was passed and because MAPA was intended to apply only to agencies who had not yet developed to their own procedures).

SWBT also asserts the PSC violated a section of the Missouri statute governing proceedings before the PSC, Mo.Rev.Stat. § 386.420(1). This section grants parties the "right to be heard and to introduce evidence." *Id.* SWBT has not met its burden to prove that this statute was violated. As noted earlier, the PSC granted SWBT the opportunity to be heard and to introduce evidence.

 SWBT finally argues that the PSC violated its own regulations, which provide that "[i]n any hearing before the Commission, [contested case procedures] shall apply, as supplemented by these rules," 4 C.S.R. 240–2.130(1) (1999), *see also,* 4 C.S.R. 240–4.020(6) (1992). The PSC argues that this regulation applies only to "hearings," rather than to arbitrations conducted pursuant to the federal Telecommunications Act. This Court will defer to the PSC's interpretation of its own regulations as long as it does not violate a constitution or statute and it is not plainly erroneous or inconsistent with

the regulation. *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (defining this standard to evaluate federal agency's interpretations of its own regulation); *Smith v. Sorensen*, 748 F.2d 427, 432 (8th Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985) (state agency's interpretation of its own regulation should be given "significant weight"). Under the *Seminole Rock* standard, the Court will defer to the PSC's interpretation that contested case procedures do not apply to arbitrations conducted pursuant to the Telecommunications Act.

## C. Whether the PSC Unlawfully Required SWBT to Combine Network Elements

 SWBT next argues that the PSC violated the Telecommunications Act when it required SWBT to provide combinations of network elements that were not currently combined in SWBT's network. AT & T responds that SWBT waived this argument when it voluntarily agreed to combine network elements. For the reasons explained below, the Court agrees with AT & T.

SWBT argues that it only agreed to combine network elements because it was under a legal obligation to do so when the Agreement was filed. However, neither FCC regulations nor PSC rulings required this when SWBT filed the interconnection agreement on October 10, 1997. Although FCC regulations once required incumbents to combine elements, 47 C.F.R. § 51.315(c)—(f), these regulations were vacated by the Eighth Circuit in July 1997.

*Iowa Utils. Bd.*, 120 F.3d at 813 (vacating 47 C.F.R. § 51.315(c)-(f)).[13]

Because the FCC regulations had been vacated, SWBT was under no obligation to combine network elements for AT & T that were separate in its own network. Nevertheless, SWBT submitted an agreement stating that it would combine network elements. Although SWBT later objected that this act was involuntary, it failed to make a contemporaneous objection when submitting the agreement. Consequently, the PSC noted that the Eighth Circuit's ruling in *Iowa Utilities Board* did not prohibit incumbents from agreeing to combine network elements, and then required SWBT to do so. [Report and Order of December 23, 1997, ROA 1980–82]. This reasoning included at least an implicit finding that SWBT voluntarily agreed to combine network elements. That finding was neither arbitrary nor capricious.

Having found that AT & T and SWBT had reached an agreement on this issue, the PSC was well within its authority to enforce that agreement. Such party negotiations are the first and arguably most important of the dispute resolution mechanisms that Congress incorporated into the telecommunications act. *See* 47 U.S.C. § 252. The PSC therefore properly required SWBT to abide by its contractual agreement.

## D. Whether the PSC Unlawfully Expanded SWBT's Obligation to Provide Network Elements

SWBT contends that the PSC violated the Telecommunications Act when it re-

---

**13.** A distinction must be made between regulations requiring SWBT not to separate network elements that were combined in its own network if the elements are requested in combination, and those requiring SWBT to combine network elements that existed separately in its network if requested. The FCC regulation requiring SWBT not to separate elements, 47 C.F.R. § 51.315(b), was still in effect when the agreement was filed. Four days later, the Eighth Circuit amended its decision in *Iowa Utilities Board* to also vacate this regulation. 120 F.3d at 813 (as amended on rehearing, vacating 47 C.F.R. § 51.315(b)). When *Iowa Utilities Board* went up to the Supreme Court, the regulation forbidding incumbents from separating elements was reinstated. *Iowa Utils. Bd.*, 119 S.Ct. at 737–38 (reinstating 47 C.F.R. § 51.315(b)). SWBT originally alleged that it could not be forbidden to separate elements that were already combined in its network. SWBT admits that this issue has been rendered moot by the Supreme Court's decision reinstating 47 C.F.R. § 51.315(b). 119 S.Ct. at 737–38.

quired SWBT to provide dark fiber and to unbundle subloops. The Act requires incumbents to provide unbundled access to network elements, 47 U.S.C. § 251(c)(3), which are "facilit[ies] or equipment used in the provision of a telecommunications service." 47 U.S.C. § 153(29).

 SWBT first argues that dark fiber is not a network element. Dark fiber is fiber optic cable that is not currently connected to electronic equipment and is not currently being used to provide services. In fact, as soon as dark fiber is "lit" by being connected to electronic equipment and used to provide telecommunications services, it ceases to be dark fiber. SWBT, therefore, reasons that because dark fiber is, by definition, not being used to provide telecommunications service, it falls outside the definition of network elements.

This almost metaphysical argument cannot succeed. The Eighth Circuit has noted that the term "network element" should be interpreted broadly to encompass "all of the facilities that are used in the overall commercial offering of communications." *Iowa Utils. Bd.*, 120 F.3d at 809. SWBT proposes a narrow interpretation of the term, essentially arguing that when Congress defined network elements as "equipment used in the provision of a telecommunications service," it meant to limit this definition to equipment currently being used by a particular provider. Given the purpose of the Telecommunications Act and the Eighth Circuit's guidance, the Court rejects SWBT's invitation to read a "temporal qualifier" into this statute. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (refusing to read Title VII's definition of "employees" to refer only to current employees).

 SWBT also argues that because dark fiber is not currently connected to SWBT's network, it is inventory rather than equipment. Unbundled network elements include only equipment used in providing telecommunications services. 47 U.S.C. § 153(29). The Court, however, agrees with the PSC that dark fiber is equipment. Dark fiber is cable that has already been placed in the ground, which could be used to transmit calls if it were connected to the proper electronics. Such cable, once it is connected to the rest of a network, is commonly used to provide telecommunications service. For this reason, "dark fiber falls clearly within the definition of a network element." *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.*, 7 F.Supp.2d 674, 680 (E.D.N.C.1998).

 SWBT next argues that the PSC ignored its arguments that providing access to dark fiber and unbundling subloops[14] were technically infeasible, and that it therefore had no duty to provide such access. *See* 47 U.S.C. § 251(c)(3) (ILECs have no duty to provide unbundled access unless it is technically feasible). It is by now well-established that agencies must give reasons for their decisions. *See Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 295 (8th Cir.1985) (requiring an agency "to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."). Although courts "may not supply a reasoned basis for the agency's decision that the agency itself has not given," *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987), they will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

---

**14.** Subloop unbundling occurs when an ILEC allows a requesting carrier to access specific parts of a local loop, the wiring that connects each customer to the network. Competitors can then process calls by connecting their equipment to certain subloops and bypassing others.

In this case, the path of the PSC can reasonably be discerned, and its decision should therefore be upheld. Restrictions on access are presumed to be unreasonable, and SWBT had the burden of proving infeasibility by clear and convincing evidence. *MCI Telecommunications Corp.*, 7 F.Supp.2d at 680; 47 C.F.R. § 51.5. Regarding dark fiber, the PSC emphasizes that SWBT only alleged that providing access would interfere with testing and maintenance, but that testimony indicated that such testing and maintenance could be performed by the CLECs using the dark fiber. Similarly, SWBT fell far short of proving by clear and convincing evidence that unbundling subloops was technically infeasible. In this appeal, they point to the testimony of William C. Deere, who testified that subloop unbundling could cause a network failure and would reduce SWBT's ability to manage its network. This testimony did not establish the "specific, significant, and demonstrable network liability concerns" necessary to prove technical infeasibility.[15] 47 C.F.R. § 51.5. Although it would have been preferable for the PSC to explain specifically why it rejected SWBT's infeasibility argument in the arbitration order, its failure to do so does not require a remand. The qualified nature of the testimony, combined with the PSC's conclusion that SWBT must provide access to dark fiber and unbundled subloops, convinces this Court that the PSC reasonably concluded that SWBT failed to meet its burden of proving technical infeasibility.

Finally, SWBT argues that the PSC applied the wrong standard to determine whether SWBT must provide access to these elements in light of the Supreme Court's decision in *Iowa Utilities Board.* The Telecommunications Act directed the FCC to determine what network elements should be made available on an unbundled basis by considering at least the following two factors: first, whether the elements are necessary; and second, whether the

failure to provide them would impair requesting carriers' ability to provide the services they seek to offer. § 251(d)(2). In interpreting these sections, the FCC stated that access was "necessary" even if "requesting carriers can obtain the requested proprietary element from a source other than the incumbent [because] requiring new entrants to duplicate unnecessarily even a part of the incumbent's network could generate delay and higher costs for new entrants, and thereby impede entry by competing local providers and delay competition, contrary to the goals of the 1996 Act." *Local Competition Order* at ¶ 283. The FCC also stated that the "impairment" standard would be met if "the failure of an incumbent to provide access to a network element would decrease the quality, or increase the financial or administrative cost of the service a requesting carrier seeks to offer, compared with providing that service over other unbundled elements in the incumbent LEC's network." *Id.* at ¶ 285.

Under these standards of necessity and impairment, the FCC promulgated the regulation codified at 47 C.F.R. § 51.319. The regulation required SWBT to provide AT & T with access to at least the following network elements: (1) the local loop; (2) the network interface device; (3) switching capability; (4) interoffice transmission facilities; (5) signaling networks and call-related databases; (6) operations support systems functions; and (7) operator services and directory assistance. § 51.319(a)—(g). The Supreme Court vacated this regulation in *Iowa Utilities Board,* reasoning as follows:

> The Commission's premise was wrong. Section 251(d)(2) . . . . requires the Commission to determine on a rational basis which network elements must be made available, taking into account the objectives of the Act and giving some substance to the "necessary" and "impair"

15. AT & T also emphasizes that other ILECs are currently unbundling subloops under their interconnection agreements, thus providing further reason to doubt SWBT's claim that subloop unbundling is technically infeasible. [AT & T Opp. at 38, n.19].

requirements. The latter is not achieved by disregarding entirely the availability of elements outside the network, and by regarding any "increased cost or decreased service quality" as establishing a "necessity" and an "impair[ment]" of the ability to "provide ... services."

*Iowa Utilities Bd.,* 119 S.Ct. at 736.

The FCC has also promulgated a "catch-all" regulation under which state commissions determine whether ILECs should be required to provide access to equipment and facilities not listed in § 51.319. Section 51.317(b) requires that any element that it is technically feasible for an incumbent to provide on an unbundled basis must be provided unless either: (1) the element was proprietary or contained proprietary information, and a requesting carrier could offer the same service by using other non-proprietary unbundled elements within the incumbent's network; or (2) failure to provide the element would not decrease the quality or increase the administrative cost of the services the requesting carrier planned to offer. 47 C.F.R. § 51.317(b).[16] In this way, § 51.317 incorporated the FCC's necessity and impairment standards. Nevertheless, the Supreme Court did not vacate § 51.317, even though it rested on the same necessity and impairment standards it criticized when vacating § 51.319. Dark fiber and unbundled subloops were not among the elements specifically listed in the vacated regulation. Therefore, the PSC considered whether SWBT must provide access to them under the catch-all regulation, § 51.317.

SWBT argues that § 51.317 is no longer a valid regulation, because the Supreme Court condemned the FCC's necessity and impairment standards when it vacated § 51.319. SWBT also emphasizes that the PSC admits it applied an invalid standard when determining whether it should be required to provide access to dark fiber and unbundled subloops.[17]

Although the Court is impressed by the logic of SWBT's argument, and would vacate § 51.317 pursuant to the logic of the Supreme Court's decision if it had the authority to do so, the fact remains that this Court lacks jurisdiction to vacate FCC regulations. While the Supreme Court could have vacated § 51.317 under the same reasoning it used to vacate § 51.319, it did not do so. For this reason, § 51.317 is still a valid FCC regulation that cannot be challenged in this Court. Because the PSC used § 51.317 to require SWBT to provide access to dark fiber and subloops, the Court will not reverse its decision. Nevertheless, because of the serious questions the Supreme Court's decision raises about the validity of § 51.317, the Court will accept the PSC's invitation to remand the issues of dark fiber and subloops for further consideration in light of the revised standards to be promulgated by the FCC.

**E. Whether the PSC Unlawfully Failed to Provide Any Means for SWBT to Limit Its Liability to AT & T Customers and Failed to Consider This Cost in Setting Rates**

 SWBT's final argument is that the PSC erred by refusing to allow SWBT to limit its liability to AT & T's customers. Telephone providers typically limit their

---

**16.** Although the Supreme Court did not vacate this regulation, the Eighth Circuit had previously vacated it to the extent that it created a presumption that a network element must be unbundled if it is technically feasible to do so. *Iowa Utilities Bd.,* 120 F.3d at 810, n. 30. In this opinion, all citations to § 51.317 refer to that regulation as it was modified by the Eighth Circuit.

**17.** The PSC admits that its "determination that access must be provided to dark fiber and subloop elements was based on that same 'impairment' standard, as was then required by the FCC's now invalid rule [§ 51.319]." [PSC Supplemental Br. at 3–4]. For this reason, the PSC requests that this Court either defer ruling on these issues until after the FCC redefines this standard, or remand the issues to the PSC for further consideration in light of the new standard to be promulgated by the FCC.

liability to their customers to the amount their customers paid for the service, except in cases of gross negligence or intentional misconduct. SWBT sought to mimic this practice in the Agreement. It proposed that AT & T and SWBT each indemnify the other for claims brought by its own customers, except in cases of gross negligence or intentional misconduct. In this way, each company could limit its liability to its own customers by contract and would not be liable for negligently inflicting injury on the other's customers. The PSC rejected this proposal, thereby eliminating SWBT's ability to limit its liability to AT & T's end users for ordinary negligence. The PSC instead accepted AT & T's proposal that "each party be responsible for the damage it causes toward [customers]." [Report and Order of December 23, 1997, at 39, ROA 1962]. Thus, because of the PSC's order, SWBT would be fully liable to AT & T's customers for ordinary negligence, while its liability to its own customers would be limited.

 SWBT argues that this ruling violated the Telecommunications Act by requiring it to provide better interconnection to AT & T than it provides to itself. 47 U.S.C. § 251(c)(2)(C) (requiring incumbent to provide interconnection "that is at least equal in quality to that provided by the local exchange carrier to itself."); *Iowa Utilities Bd.*, 120 F.3d at 812 (ILECs cannot be required to provide superior interconnection to CLECs). The term interconnection, however, "refers only to the physical linking of two networks for the mutual exchange of traffic." *Local Competition Order* at ¶ 176; *aff'd Competitive Telecommunications Ass'n v. F.C.C.*, 117 F.3d 1068, 1072 (8th Cir.1997). Interconnection does not encompass, for example, the transport and termination of traffic. *Local Competition Order* at ¶ 176. Hence, AT & T argues that because the PSC's allocation of legal liability has nothing to

do with physical interconnection service, there is no violation of 47 U.S.C. § 251(c)(2)(C). SWBT responds that the PSC's allocation of liability does require SWBT to provide superior physical interconnection services to AT & T. It reasons that, as a practical matter, the PSC's order requires it to provide better service to AT & T to avoid the risk of negligence claims by AT & T customers. On the other hand, when serving its own customers, SWBT need not eliminate all negligence or the appearance of negligence that might subject it to expensive litigation because it can contractually limit its liability. The Court agrees with SWBT that this scheme violates the Act.[18]

AT & T argues that the PSC's decision is efficient, because imposing liability on SWBT creates an incentive for the incumbent to avoid negligently injuring AT & T and its customers. First, regardless of contrary policy consideration, the Court is limited by the requirements of the Act. Second, even in the absence of this arrangement, SWBT has a financial incentive to avoid negligently injuring AT & T and its customers. The Agreement renders SWBT liable to AT & T for negligent injuries it causes to AT & T. SWBT is also required by the Act to provide nondiscriminatory access to its network. 47 U.S.C. § 251(c)(3). SWBT, therefore, has a compelling incentive to provide AT & T customers with at least as good a service as it provides to its own customers. Otherwise, it is in violation of either the Act or the Agreement. Requiring SWBT to be directly liable to AT & T customers, however, would force SWBT to provide to AT & T customers a better service than it currently provides to its own customers. Because this violates the Act, the Court reverses and remands the PSC's decision on this issue.

---

18. This interpretation of the Act also avoids the potential "takings" argument that would be present if the government were to require an ILEC to provide a better product to its competitors' customers than it provides to its own customer, without any compensation.

**F. Whether the PSC Violated the Telecommunications Act by Failing to Require SWBT to Purchase the Licenses Required to Allow AT & T to Use Its Network Without Violating the Intellectual Property Rights of Third Parties**

AT & T also makes two objections to the PSC's rulings: (1) that the PSC should have required SWBT to provide licenses for the intellectual property used in its network; and (2) that the PSC wrongly prohibited the aggregation of toll services for resale and restricted AT & T's resale of promotional offerings of 90 days or fewer. The Court will consider these arguments in turn.

■■■ First, AT & T argues that the PSC violated the Telecommunications Act when it failed to require SWBT to purchase any licenses and "right to use agreements" [19] necessary to allow AT & T to use SWBT's network without incurring liability. Much of SWBT's network uses equipment and software that is subject to third-parties' intellectual property rights. SWBT purchased licenses allowing it to use this equipment while respecting these intellectual property rights. Some of SWBT's licenses state that only SWBT may use the equipment or software. Thus, the PSC was asked to decide whether SWBT must purchase the licenses necessary to allow AT & T to use the intellectual property without incurring liability. The PSC did not require SWBT to purchase these licenses. However, it ordered SWBT to provide a list of all known licenses applicable to the relevant network elements, to use its best efforts to facilitate AT & T's attempts to obtain the necessary licenses, and to negotiate for the provision of alternate elements if a necessary license could not be obtained.

AT & T asserts that this issue of whether ILECs must purchase licenses for competitors is currently pending before the FCC, and asks the Court to defer ruling until the FCC case reaches its resolution. AT & T has not filed a formal motion for a stay, and the Court believes that it has ample information with which to evaluate whether the PSC violated the Telecommunications Act even in the absence of an applicable FCC regulation.

Turning to the merits of AT & T's challenge, the Court holds that the PSC's decision did not violate the Telecommunications Act. AT & T argues that the PSC's ruling violates the Act's requirement that incumbents provide "nondiscriminatory" access to network elements. § 251(c)(3); *Iowa Utilities Bd.*, 120 F.3d at 812 (ILECs must provide requesting carriers with services of equal quality to those they provide themselves); *Local Competition Order* ¶¶ 312–313 and 315 (access must be nondiscriminatory and equal to the terms and conditions under which ILEC's provide services to themselves).

AT & T argues that this requirement was violated because "the Agreement allows SWBT effectively to deny access to unbundled network elements by withholding the software and other embedded intellectual property necessary to use them." [AT & T Sugg. at 10]. Strictly speaking, however, the licenses are not necessary to enable AT & T to use SWBT's network. AT & T could use the network without obtaining the licenses, even though doing so would violate others' intellectual property rights. For this reason, the PSC concluded that Agreement does not violate the Act by denying AT & T access to SWBT's network:

> SWBT's proposed language would not make AT & T's purchase of the necessary copyrights a condition precedent to provisioning UNEs, but merely clarifies that SWBT cannot be held responsible to third parties for AT & T's copyright infringements. Also, AT & T's argument is undercut by SWBT's promise to assist AT & T in locating the applicable

---

**19.** For the remainder of this opinion, both licenses and right to use agreements will be referred to as licenses.

property rights. It is difficult to see how SWBT could successfully prevent AT & T's use of UNEs on the ground that AT & T had failed to seek necessary licenses when SWBT would itself be under an obligation to disclose any known intellectual property rights to AT & T. The Commission also finds that SWBT's proposed language merely exculpates SWBT and requires AT & T to defend, hold harmless, and indemnify SWBT for AT & T's infringement. This does not violate the Act.

[Report and Order of January 2, 1998, ROA 2000]. Thus, the PSC's ruling does not allow SWBT to refuse access to its network on the grounds that AT & T has not obtained the necessary licenses.

Nor did the PSC's ruling deny AT & T access in practical effect, because SWBT was required to assist AT & T in purchasing the relevant licenses. The requirements imposed on SWBT are more than sufficient under the standard articulated by the FCC in an analogous context:

> [P]roviding incumbent LECs may not evade their ... obligations merely because their arrangements with third party providers of information and other types of intellectual property do not contemplate—or allow provision of certain types of information to qualifying carriers. Therefore, we decide that the providing incumbent LEC must determine an appropriate way to negotiate and implement ... agreements with qualifying carriers, i.e., without imposing inappropriate burdens on inappropriate carriers. In cases where the only means available is including the qualifying carrier in a licensing arrangement, the providing incumbent LEC will be required to secure such licensing by negotiating with the relevant third party directly ... We merely require the providing incumbent LEC to do what is necessary to ensure that the qualifying carrier effectively receives the benefits to which it is entitled.

[12 FCC Rcd. 5470 (1997) at ¶ 70]. This ruling, quoted by AT & T, does not require incumbents to negotiate directly with third-parties in all cases. Rather, it requires incumbents "to do what is necessary" to allow competitors to use their networks without incurring liability. The PSC reasonably concluded that AT & T would be able to purchase the relevant licenses if SWBT provided the names of the relevant third parties and used its best efforts to help AT & T reach agreements with these parties.

AT & T also argues that the cost of obtaining the relevant licenses would have been lower if the PSC had ordered SWBT to obtain them. AT & T argues that "it is undeniable that the additional costs of any negotiations and, more fundamentally, the disparate costs of access they will inevitably produce, violate the Act's nondiscrimination requirement." [AT & T Sugg. at 14]. AT & T first notes that SWBT was allowed to choose among competing vendors when purchasing its licenses, while AT & T will be "a captive customer of ... SWBT's previously selected vendors." [SWBT Sugg. at 14]. Thus, AT & T reasons that it will have to pay more than SWBT paid for access to the same equipment and software. AT & T fails to acknowledge that at this time, AT & T and SWBT are both captive customers. If the PSC had ordered SWBT to purchase the relevant licenses for AT & T, then SWBT would need to purchase these intellectual property rights from the same vendors from which it purchased its original licenses. For this reason, AT & T has failed to show that the PSC increased the cost of licenses and agreements allowing AT & T to use SWBT's network by requiring a captive customer to negotiate for these rights. Nor is the Court persuaded that the fact that intellectual property rights may cost AT & T more than they cost SWBT constitutes discrimination under the Act. The Act specifically provides that rates for interconnection and unbundled network elements shall be based on the cost of providing such access. 47 U.S.C. § 252(d)(1)(A). Part of the cost of interconnection is obtaining the relevant licenses (or being subject to liability). If SWBT

were required to purchase these licenses for AT & T, then it could legitimately pass these costs through to AT & T in increased rates. For this reason, it is not discriminatory that the Agreement requires AT & T to pay these higher costs directly. Either way, the cost for SWBT to provide service would be lower than the cost for AT & T.

AT & T further argues that SWBT is in a better position to determine whether amendments to its existing licensing agreements are necessary to allow AT & T to use SWBT's network without incurring liability. AT & T reasons that because contracts are construed in accordance with parties' intent, and because SWBT is a party to its licenses, that it has better information about whether these licenses would allow AT & T to use the equipment or software at issue, or whether an amendment would be necessary. SWBT responds that "[o]nly AT & T can know the uses to which it will put a particular element as well as how that element will interact with other AT & T elements-factors essential to determine what intellectual property rights are at stake." [SWBT Opp. at 7]. The Court does not find the potential inefficiency complained about by AT & T to constitute discrimination under the Act.[20]

### G. Whether the PSC Unlawfully Restricted AT & T's Resale Rights

■ AT & T next argues that the PSC violated the Act by restricting its resale rights under § 251(c)(4). This subsection requires ILECs such as SWBT "to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." § 251(c)(4)(A). It also forbids "unreason-

able or discriminatory conditions or limitations on the resale of ... telecommunications service." § 251(c)(4)(B).

AT & T claims that the PSC violated its resale rights by barring it from aggregating toll service for resale and restricting its ability to resell promotional offerings lasting 90 days or fewer. AT & T first challenges the section of the Agreement providing that "[t]he parties will maintain the restrictions on aggregation of toll service for resale. All other restrictions are presumed not to apply until the Parties identify and ask the Commission explicitly for imposition." [Agreement of March 4, 1998, Rec. Doc. # 16 (Appendix to Agreement 1: Resale ¶ 1.12) ]. This ruling forbids AT & T from purchasing toll service that SWBT only sells to single customers and reselling the service to groups of customers. [See PSC Opp. to AT & T at 11]. For example, under the Agreement, AT & T cannot resell SWBT's "Plexar" service to groups of customers. Plexar service is a private telephone network for customers with multiple users, but SWBT offers Plexar service only to single customers. Thus, SWBT would presumably offer Plexar service to one corporate customer with many employees using its telephones but not to a group of several individuals who each use only one telephone. AT & T explains that aggregation "benefits customers who would not independently qualify to receive services SWBT offers only to other subscribers who satisfy certain restrictive conditions, by permitting resellers to obtain those services in their stead and resell them, free of the restrictive conditions." [AT & T Reply at 8].

Plexar and similar toll services are certainly provided "at retail to subscribers who are not telecommunications carriers,"

---

20. AT & T also argues for the first time in its reply brief that there is no evidence that the costs SWBT paid to obtain its licenses were excluded from the PSC's computation of rates. Because the other parties have not had an opportunity to respond to this argument, addressing it would require the Court to search the entire record to verify this negative assertion. Situations such as this seem to be the very reason why arguments raised for the first time in a reply brief are waived unless some reason is provided for failing to raise the argument in the opening brief, *United States v. Brown*, 108 F.3d 863, 867 (1997) (choosing not to review issue raised for the first time in a reply brief).

§ 251(c)(4)(A), and any restriction on their resale is therefore presumptively unreasonable. *Local Competition Order* at ¶ 948 (statute "makes no exception for . . . contract and other customer-specific offerings."). However, the PSC's ruling on this issue was not a restriction on resale, because eliminating the single customer restriction would transform SWBT's toll service into a completely different service. SWBT submitted testimony to the PSC that if AT & T were allowed to offer Plexar service to multiple customers, "it could turn Plexar into a completely new quasi-local service, providing the equivalent of local service to an unlimited number of users, and bypassing SWBT's legitimate charges for local exchange service." [SWBT Opp. at 9, citing Direct Test. of Daniel L. Jackson at 16–20 (Sept. 18, 1996) ]. Applicable FCC regulations explain that ILECs have no obligation under § 251(c)(4) to sell to their competitors services that are different from the ILECs offer to their own customers:

> The principal distinction between sections 251(c)(3) and 251(c)(4), in terms of the opportunities each section presents to new entrants, is that carriers using solely unbundled elements, compared with carriers purchasing services for resale, will have greater opportunities to offer services that are different from those offered by incumbents. More specifically, carriers reselling incumbent LEC services are limited to offering the same service an incumbent offers at retail. This means that resellers cannot offer services or products that incumbents do not offer. The only means by which a reseller can distinguish the services it offers from those of an incumbent is through price, billing services, marketing efforts, and to some extent, customer service.

*Local Competition Order* at ¶ 332. SWBT presented sufficient testimony from which the PSC could reasonably conclude that eliminating the single customer restriction from its toll service would transform it into a different service. The PSC therefore reasonably concluded that SWBT was only required to resell toll service with the same use limitations that it imposed on its own customers. [*See* PSC Opp. to AT & T at 11 ("Resale of a specific service is customer-specific.") ].

Finally, AT & T challenges a section of the Agreement stating that "promotions of 90 days or less will be available for resale at the retail rate less the established avoided cost discount (i.e., AT & T may not elect the promotional rate)." [Agreement, March 4, 1998, Rec. Doc. # 16]. The Act provides that services for resale shall be priced as follows: "a State commission shall determine wholesale rates on the basis of retail rates charges to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier." § 252(d)(3). The FCC has ruled that promotional offerings of 90 days or less must be resold, but that the promotional rate does not constitute a "retail rate" which must then be discounted to compute a wholesale rate:

> An incumbent LEC shall apply the wholesale discount to the ordinary rate for a retail service rather than a special promotional rate only if:
>
> (i) such promotions involve rates that will be in effect for no more than 90 days; and
>
> (ii) the incumbent LEC does not make use of such promotional offerings to evade the wholesale rate obligation, for example by making available a series of 90–day promotional rates.

47 C.F.R. § 51.613(a)(2); *see also Iowa Utils. Bd.*, 120 F.3d at 818–19 (upholding this regulation); *Local Competition Order* at ¶ ¶ 949–950. The FCC has not directly addressed the issue of whether requesting carriers can elect to purchase services at the promotional rate rather than the wholesale rate, however.

AT & T argues that it must be allowed to elect the promotional rate, because otherwise SWBT would be able to offer pro-

motional rates that are lower than the wholesale rates charged to its competitors. The FCC already addressed this issue, and concluded that the potential anti-competitive effects of promotional offerings were offset by their competitive effects, especially because the promotional offerings were limited to 90 days and could not be offered consecutively. *Local Competition Order* at ¶ 950.

AT & T also argues that the language of the Act requires that it be allowed to choose the promotional rate rather than the wholesale discount. AT & T cites two cases concluding that "promotional programs ... are telecommunications services which ... must be made available for resale." *Iowa Utils. Bd.*, 120 F.3d at 819; *accord MCI Telecommunications Corp.*, 7 F.Supp.2d at 682–83. Neither the *MCI* case nor the Eighth Circuit's decision requires that requesting carriers be allowed to purchase short-term promotions at promotional rates. AT & T reasons, however, that a short-term promotional offering is nothing but ordinary SWBT services offered at a discount, and that if such discounts are "services" that must be resold, then AT & T must be allowed to elect the promotional rate. [*See* AT & T Reply at 15, n.13]. The *MCI* case, upon which AT & T relies, shows the flaw in this reasoning. In *MCI*, the agreement provided that "short-term promotions shall not be available for resale," in clear violation of the FCC regulations. The requesting carrier objected that "BellSouth may market new and innovative combinations as short-term promotions," which would not be available for resale to MCI. *Id.* at 682. The court agreed that MCI had "a right under the Act to purchase those combinations **at a wholesale rate.**" *Id.* (emphasis added). A short-term promotional offering consists of both a particular package of services and a promotional rate. If the services are available for resale at wholesale rates, then the requirements of the Act are satisfied. *Id.* This interpretation is supported by the language of the Act and the text of the applicable FCC regulations, both of which state that services should be priced for resale by applying a wholesale discount to a retail rate. Neither the statute nor the regulations makes any reference to requesting carriers being allowed to elect to purchase services at a promotional rate instead. For this reason, the PSC's ruling about promotional rates must be affirmed.

## V. *Conclusion*

Accordingly, it is hereby ORDERED that SWBT's Motion for Summary Judgment (Doc. # 43) is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED to the extent that the PSC's rulings discussed in this opinion concerning dark fiber and subloops are REMANDED so that the PSC can reconsider these issues in light of new standards to be promulgated by the FCC. It is also GRANTED to the extent that the PSC's ruling rendering SWBT liable for injuries to AT & T's customers caused by its negligence is REVERSED AND REMANDED. In all other respects, the Motion is DENIED. It is further

ORDERED that in all other respects, the PSC's rulings are AFFIRMED. It is further

ORDERED that AT & T's Motion for Summary Judgment (Doc. # 45) is DENIED. It is further

ORDERED that AT & T's Motion for Leave to File Supplemental Response Brief Concerning the Supreme Court's *Iowa Utilities Board* Decision (Doc. # 79) is GRANTED. It is further

ORDERED that BroadSpan Communications's Motion to Withdraw Application to Intervene and [to Withdraw] Motion for Protective Transition Measures (Doc. # 82) is GRANTED. The Application to Intervene (Doc. # 31) and Motion for Protective Transition Measures (Doc. # 33) are WITHDRAWN. It is further

ORDERED that the Motion to Intervene by the United States of America (Doc. # 92) is GRANTED. The United States has already filed its brief in re-

sponse to the Court's order of August 12, 1999.